SEBASTIÁN AMARAL AMARAL, Plaintiff and Appellant, *v.* DR. ROBERTO F. FORTUÑO ET AL., Defendants and Appellees.

No. R-63-120.     Decided December 23, 1966.

*Noel Colón Martínez* and *Miguel A. Velázquez Rivera* for appellant. *F. Fernández Cuyar* and *Rafael A. González* for appellees.

Second Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Santana Becerra, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

The question to be determined is whether an urologist is responsible for the damages suffered by a patient who had been recently operated on for a detachment of the retina, which condition was known to the urologist, when the patient fell from the examination table at the physician's office, after the latter had finished examining him. We believe that the evidence showed, contrary to what the trial court concluded, that the physician was negligent in not helping the patient to come down from said examination table and that, therefore, he should be liable for the damages the fall caused the patient.

Sebastián Amaral, 71 years old, after having undergone an operation for cataracts in both eyes suffered the detach-

ment of the retina of his right eye, for which he was operated on February 6, 1962. This was the result of a fall he had when he tried to sit on a chair. Before that, the vision in his right eye reduced to from 50 to 60% with glasses. After his fall his vision through that eye was reduced to 5%. Dr. Federico Maestre, the oculist who operated on him, testified that he saw Amaral again in his office on the 23rd of that same month of February 1962; that "the eyeground looked opaque and that he could not definitely say the result of the detachment that Amaral had had. Sometimes it takes a month to decide whether or not the retina will adhere after the operation," that "the way matters stand nowadays, concerning the retina, 60% of the retina adheres and 40% does not, regardless of whether there occurs a trauma or not"; that if the operation is a success, vision can be restored to the original 50% he had prior to the detachment. This reduction in vision before the detachment in question was the result of a degenerative pathology, which condition could cause the operation to fail, because "it is not the same thing to start with a 20/20 eye which has suffered a detachment, as to start with an eye with half vision and has a detachment, that is, an operation is very different with a young person than with an old person"; he added that Amaral had perception of light after the operation; that the condition of the visual organ was also better than before; that he recommended that the patient have his prostate examined because during his stay in the hospital he had to get up very frequently to urinate. For that purpose he recommended appellee, Dr. Fortuño, who had examined Amaral at the Pavía Hospital shortly before the operation in question and visited him there during 10 or 12 days before and after the operation, of which Dr. Fortuño was informed then. Dr. Maestre said that he asked Dr. Fortuño to examine Amaral after the operation because he suspected something was wrong with his prostate. Dr. Maestre ex-

plained that "retina patients should not be getting up from the bed like that [Amaral was getting up all night long] so frequently"; that his conversation with Dr. Fortuño was with respect to the convenience of having patient Amaral move as little as possible.

On February 23, 1962, after Dr. Maestre examined and treated the eye recently operated, patient Amaral went to Dr. Fortuño's office accompanied by his son. Appellant testified that from the waiting room he went "to that place where they perform the examination"; that his son stayed outside; that Dr. Fortuño asked him to undress; that the doctor examined his prostate while he was standing up; that afterwards the doctor ordered him to climb on the examination table which he did with the help of appellee, which help the patient asked for because he could not see well; that after the doctor finished examining him he asked the patient to come down from the table; that he said "Come down, and upon giving him that order (appellant means Dr. Fortuño) he continued walking towards the right from the direction where he was; that then the appellant sat up with his feet hanging on both sides of the examination table; that "when I straightened up to come down, well, I lost control, tried to hold on to something but was unable to and fell to the floor, and received a wound in my forehead;" that he tried to sit up but Dr. Fortuño ordered him to lie down on the floor and started to exert pressure on his forehead; that shortly afterwards he asked for the son to be called in and together they put him on the table; that the doctor called the Pavía Hospital and an ambulance which took Amaral to said hospital where they examined and treated him. On cross-examination he said that before the accident "when he (Dr. Maestre) removed the bandage I saw the movement of his hands with the eye"; that before he could read with his left eye; that after the accident he cannot read with that eye. On cross-examination he repeated

his version on how he fell from the examination table. He said: "When he asked me to come down, I sat up. Then my feet were hanging on both sides of the table. When I tried to change to get down, I straightened up, well, I lost balance and tried to hold on to something and fell to the floor"; that at that moment Dr. Fortuño was about 5 or 6 feet away from him, walking with his back to the patient. The Court observed that appellant looked young for his age; that he "does not show his age."

Dr. Maestre testified that a 70-year-old person with retinal and general vision problems requires lots of care "because the trauma is important . . . you have to be very careful with them; that the vision difficulty could affect their balance; that circulation in the brain is not good, that this criterion is known by professionals; that when Amaral went to see him he helped the patient to sit on the examination chair because it is a little high; that the son accompanied him "but watching him under his direct care." Dr. Maestre added that "if I would have gone to examine him I would have helped him lie down and if he were to get up, well, I would have assisted him . . . to get up"; that it was possible that it might have been dangerous to allow him to get down from the bed without assistance.

On the other hand Dr. Fortuño testified that appellant walked into his office by himself; was talking coherently. The doctor asked him to remove his clothes. He did so and hung them up on a special hook provided for that purpose; he urinated in a glass jar the doctor gave him. The doctor asked him to climb on the table, which he did; that as the prostatic examination is the last one done he did not perform it on the patient that afternoon; that after checking his blood pressure, examining the abdomen and the genitals he told the patient "Let's get you up Don Sebastián Amaral and at that moment he started a movement as if to sit up, I think, and turned around . . . started to move, turned in

a circle and fell down over the left side of the table . . . and fell to the floor"; that "I was close to the table . . . I ran to the other side. He was on the floor. I turned him up. I asked him how he felt and he answered 'I fainted'. He told me this very clearly 'and I fell down.' " When asked why, if he was by the side of the patient on the table, he didn't hold him before the patient fell down he answered that "I could not hold him. He fell immediately. I was surprised at his movement and he fell on the other side." The trial judge then added:

"I have an idea of how it happened because I have sat on that table many times, not with the doctor, but with another doctor. Of course when one is lying down, one straightens and sits up, then the doctor comes and lowers the front part of the table for one to get down. But in this case it did not happen that way, instead, according to the doctor's testimony, he did not get up, but made a move, when trying to make a move he fell down. That is what the doctor says."

Then Dr. Fortuño testified that before the fall he did not notice any signs of dizziness in the patient and that "there was no indication that he had loss of balance and equilibrium."

The foregoing is a summary of the testimonies regarding the accident in itself. We summarize below the evidence on the causal relation between the injury received by appellant as a result of the fall in Dr. Fortuño's office and the fact that he finally lost the vision of his right eye. *Cf. Concepción Guzmán v. Water Resources Authority*, 92 P.R.R. 473 (1965).

Dr. Maestre testified that he saw Amaral again the same day, on February 23, 1962, after the 3 to 4-inch wound he suffered on the forehead, over the right eye which had been recently operated for detachment of the retina, had been sutured. He said that he examined that eye and found that a blood clot had formed therein on account of the blow sustained by Amaral in said accident; that the clot was of traumatic origin; that it took some time in being absorbed;

that the eye became more opaque and after examining him in his office several times, he later noticed that the retina was detached. Asked about the cause of this situation he answered that "regarding that, trauma is an aggravating circumstance to any retinal detachment"; that after the accident he could hardly see the light; "if his left eye were covered, with that right eye he would be unable to do a thing, he could not even walk alone." Upon testifying that the trauma aggravated the lack of vision Dr. Maestre said that "The trauma appears in the medical ophthalmological literature as one of the first aggravators of retinal detachment, either by a blow or contusion, or by a blow to the eye itself, etc."; that before the accident this doctor felt optimistic with respect to the outcome of the retinal operation but afterwards he became pessimistic; that the injury caused by the accident in question determined his change of opinion. On cross-examination he was asked if he could tell with a reasonable degree of certainty whether the trauma he saw in the patient's right eye was the direct cause that the retinal operation was not satisfactory. He answered that every trauma is in itself an aggravator for a retinal detachment; that as a result of the operation the eye looked clearer but after the accident he noticed it was more opaque.

The trial judge concluded that Amaral had a detachment of the retina of his *left* eye, that this situation developed as a result of degenerative pathology. The account we have made of the evidence shows that those conclusions are not correct. The conclusion that the retinal operation performed on appellant had only a 40% probability of success is not correct either. Dr. Maestre testified it had 60% probability of success. Lastly, it was concluded that the expert testimony was unable to show that the fall taken by Amaral in appellee's office had any effect in the failure of the operation and that the fall was not due to any negligence on the part of Dr. For-

tuño inasmuch as Amaral could climb on to the examination table by himself.

The appellant points out that the conclusions of fact of the trial court turn out to be contrary to the evidence and that said court erred in construing § 1802 of the Civil Code in a manner which relieves a physician who renders professional services in his office from complying with the general rules of care for his patients.

Having considered all the circumstances of the case, we concluded that Dr. Fortuño did not exercise the reasonable care, diligence and attention in his office that the case of Amaral required. *Cf. Ortiz* v. *Presbyterian Hospital*, 83 P.R.R. 298 (1961). The conduct of Dr. Fortuño towards Amaral in his office did not respond to the rules of procedure which should be observed in cases like that of the patient in question, rules which Dr. Maestre explained in his testimony and which we repeat below. *Sáez* v. *Municipality*, 84 P.R.R. 515, 521 (1962); *Rivera* v. *Dunscombe*, 73 P.R.R. 764, 783 (1952); Allan H. McCoid, *The Care Required of Medical Practitioners*, 12 Vand. L. Rev. 549, 613 (1958–59). In the first place, Dr. Fortuño knew about the retinal detachment operation undergone by Amaral some days before. He was not only familiar with that situation for having treated Amaral when he had the retinal operation but he had been warned by Dr. Maestre, the surgeon who performed the operation, of the care that should be exercised in cases of that nature. As a professional he is credited with the knowledge that persons over 70 years old who have retinal problems require much care because the lack of vision may affect their equilibrium. Dr. Maestre himself, notwithstanding his reluctance to testify against a fellow professional, said that when Amaral went to see him he helped the patient to sit on the examination table which is a little high and that if "I would have gone to examine him I would have helped him lie down and if he were to get up I would have assisted

him", rule of care and prevention which contrasts sharply with that observed by Dr. Fortuño in this case. He did not help the patient either to undress and, according to the physician himself, or to lie on the examination table. Then, when he finished his professional task, he contented himself with ordering the patient to come down from the table. Besides, it is not probable that when the patient started to move on the table he would have made a round turn and fallen off the side of the table opposite to that on which Dr. Fortuño was standing, with such rapidity that it was impossible for the physician standing by the side of the table to hold him and prevent the fall. Dr. Fortuño testified that Amaral told him that he had fainted. But, as Dr. Maestre indicated, such loss of equilibrium is foreseeable in such patients. And the injury resulting from the fall could also be anticipated as it is inferred from the evidence. *Cruz Costales* v. *Commonwealth*, 89 P.R.R. 102 (1963); *Pabón Escabí* v. *Axtmayer*, 90 P.R.R. 20 (1964); *Ginés* v. *Aqueduct and Sewer Authority*, 86 P.R.R. 490 (1962); *Weber* v. *Mejías*, 85 P.R.R. 72 (1962).

In *Lugo Pérez* v. *Santo Asilo de Damas*, 89 P.R.R. 242 (1963), we refused to hold a hospital liable for the death of an old lady, confined there to be operated for cataracts, whose death was caused by a cerebral hemorrhage suffered when she fell from her bed the night before the operation. In that case the cause of the fall could not be determined. The patient had not shown she required any special care which would warrant that special precautionary measures other than the regular ones be taken with respect to her. Under similar circumstances we denied liability in *Ramos Orengo* v. *Government of the Capital*, 88 P.R.R. 306 (1963). In the case at bar, on the contrary, the patient's condition, as well as the fact that on account of it his balance was affected, were known to Dr. Fortuño. The appellee knew that

very much care had to be taken with the type and condition of the patient because of the danger of trauma.

It is more logical and probable that if Amaral suffered a fainting spell or loss of equilibrium, it was not while he was lying down, but rather when he sat up on the examination table and tried to get down and that at that moment Dr. Fortuño was not close to the examination table, because as he did not look after the patient when he was undressing himself or when he lay down on the examination table, we have to assume that he was not watching the patient when he asked the latter to get down from said table. It is possible that Amaral, upon entering Dr. Fortuño's office, did not give any previous indication of loss of balance and equilibrium and as a result of the examination the doctor performed on him the former found him in normal conditions. But, in our judgment, that does not excuse the lack of care, attention and diligence on the part of the physician which the patient would require by reason of the ophthalmic condition he had which made him liable to the loss of equilibrium at any moment, and of the known danger that such condition could aggravate itself on account of any trauma the patient could suffer in the region surrounding the affected organ.

We cannot agree with the trial court in that the evidence "was unable to show that the fall taken by the plaintiff in Dr. Fortuño's examination had any effect in the failure of the operation." We conclude exactly the opposite; that the evidence showed much more than the mere possibility that the trauma caused in the visual organ recently operated contributed substantially to its final loss of vision and that this final result was due, with more probabilities, to the trauma of the fall which in its turn was due to Dr. Fortuño's carelessness. *Sáez, supra,* p. 523. It is true that due to a degenerative pathology the right eye of Amaral had its vision reduced 50%. The retinal detachment he suffered when he

fell at the moment he was trying to sit on a chair reduced it to 5%. Dr. Maestre testified that with the operation vision in that organ could be restored to 50% of normal which was what he had prior to the retinal detachment. Seventeen days after the operation Dr. Maestre examined the operated eye and found that it could perceive light, that it was better than before the operation. Amaral testified that through that eye he could see the movements of Dr. Maestre's hands when the latter removed the bandage.

The accident in Dr. Fortuño's office happened when it could not yet be determined with certainty whether the operation had been successful. But until then everything indicated that it would have been. As a result of the accident Amaral received a 3 to 4-inch wound on the forehead, over the eye which had been recently operated, which caused a clot in said organ due to the blow he received when he fell off the examination table. Dr. Maestre testified that the trauma thus suffered is one of the first aggravators of every retinal detachment. After the accident this physician examined the affected eye and found it more opaque. He said he could hardly see light. He could determine that the retina was detached; that "with that eye (the patient) could not do a thing." Dr. Maestre testified that on account of the injury suffered by Amaral in said accident he became pessimistic regarding the retinal operation.

Having considered the circumstances of the patient's age, the fact that the retinal operation could only restore 50% of the vision to the affected eye and other circumstances of the case, we estimate the damages suffered by Amaral as a result of the accident which gave rise to this action in the amount of $8,000.

Therefore, we will reverse the judgment entered in this case and in its stead will enter another ordering appellee,

Dr. Fortuño, to pay appellant $8,000 for damages he suffered, plus the costs, and $800 for attorney's fees.

Mr. Justice Belaval dissented.